# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| E. L. Phelps, M.J. McLister, D.J. Wu, S.M. Liss and W.F. Schaefer, individually and on behalf of all others similarly situated, <br><br> Plaintiffs <br><br> v. <br><br> JOHN CRUMPTON STOMBER, et. al, <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case Number 1:11-CV-01142 ABJ

DECLARATION OF MICHAEL BLAIR QC

MICHAEL BLAIR QC, of 3 Verulam Buildings Gray's Inn, London, WC1R 5NT, declares the following.

**Introduction**

1. I am a one of Her Majesty's Counsel (honoris causa) practising as a barrister from Chambers in London.
2. This Declaration is made in relation to the Consolidated Complaint which I understand to have been filed in the above-captioned proceedings. To assist me to make it, I was provided with, and I have read the material parts of, what I believe to be copies of the following, to which I make reference in my Declaration:

  a. the Consolidated Complaint dated, and I believe filed on, December 5, 2011 (**the Complaint**) by plaintiffs Phelps, McLister, Liss, Wu and Schaefer (the **Plaintiffs**);

  b. the Offering Memorandum (the **OM**) dated June 19, 2007 referred to in paragraph 74 of the Complaint;

  c. the Supplemental Offering Memorandum (the **SM**) dated June 29, 2007 referred to in paragraph 84 of the Complaint; and

  d. the opinion of Mr Anthony George Bompas QC dated January 15, 2012 and I believe filed on the 17 January 2012(the **Opinion**).

3. I have not read any of the documents referred to in the Complaint apart from the two mentioned at paragraphs 2 (b) and 2 (c) above.

4. I have been instructed to consider the Opinion and to offer my own views on issues relating to jurisdiction in the United Kingdom as a Member State of the European Union.

Overall views.

5. I have two broad conclusions at this stage. First, there is little in the Opinion with which I would disagree if (but this is an important if) I were to accept the principal assumptions which Mr Bompas QC makes. Those assumptions are, first, that the facts of the case are fully stated in the Complaint as it now stands, second that there is nothing in the documents referred to in the Complaint that adds to the facts as stated in the Complaint, and third, that the only defendants in the case by the time it comes to trial will be those who are currently served with the proceedings.

6. I, for my part, have been instructed, for the purposes of this Declaration, to disregard each of those assumptions and to consider the matter more broadly. Specifically, I am asked to advise on the basis of the OM and SM, and on certain other assumptions, to be set out hereafter. The issue whether the assumptions of Mr Bompas QC, or, alternatively, those on the basis of which I am advising, will eventually be borne out by the state of the pleaded case at trial and by the written and oral evidence to be brought to bear at trial, is not one that can be determined at this stage.

7. However, if, as seems likely at least in part, the proceedings eventually establish a different factual matrix from the one assumed by Mr Bompas QC, then, in my view, his conclusions will to that extent cease to be reliable. His main conclusions are that:

  a. the Netherlands is the relevant home state for the purposes of the prospectus in this case, and

    b. it follows that the redress to be sought by the plaintiffs in the European Union needs to be looked for in the Netherlands, and not in the United Kingdom.
8. My conclusion, on the other hand, is that:
    a. if the facts at trial show that the relevant home state was not the Netherlands, but the United Kingdom, then
    b. the redress to be sought by the plaintiffs in the European Union can properly be looked for in the United Kingdom, rather than in the Netherlands.
9. Before going into the detail supporting this conclusion, I set out for the benefit of the Court a summary of my qualifications and expertise.

Qualifications etc.

10. I hold the degrees of Master of Arts (in economics and law) and Master of Laws from Cambridge University (1962 and 1965). I also hold the degree of Master of Arts from Yale University, in the Graduate School of Political Science (1964).
11. I was called to the Bar in England and Wales by the Honourable Society of the Middle Temple in 1965, and was awarded the rank and title of Queen's Counsel, honoris causa, in 1996. I am currently in independent practice in Chambers at 3 Verulam Buildings, Gray's Inn, London WC1R 5NT. My practice consists largely, if not exclusively, of advice on financial regulatory matters, including banking, insurance and securities markets issues. I also undertake occasional court and tribunal appearances in the context of financial regulation.
12. In addition I carry out certain part time judicial functions in fields not far removed from my practice. In particular, I am a Member of the Competition Appeal Tribunal for the UK as a whole, and was until recently the President of the Guernsey Financial Services Tribunal.
13. During the year 2008, I was the Master Treasurer of my Inn of Court, that is the Honourable Society of the Middle Temple. I have been and remain the author or editor of a number of professional textbooks in the fields of financial services and financial regulation, including, most recently "Financial Services Law" (published by the Oxford University Press (**OUP**); second edition 2009), Financial Markets and Exchanges Law (OUP 2007; second edition forthcoming in 2012) and Blackstone's Guide to the Financial Services and Markets Act 2000 (OUP; second edition 2009).

14. The reason why my practice consists largely of financial regulation is this. I was until the Summer of 2000 the General Counsel to the Board of the Financial Services Authority (the **FSA**). This meant that I was the most senior lawyer in the FSA responsible for banking, securities, financial markets and insurance, and had a staff of around 50 lawyers. I had held that post since 1997, when the FSA was established. I was also, during 2001 to 2002, the Chairman of the Securities and Futures Authority, the self-regulating organisation that was responsible until December 2001 for the regulation of firms carrying on the type of business with which this case is concerned. Before 1997, I had been from 1987 to 1997 the principal legal officer in the Securities and Investments Board, which regulated securities and investment markets and which was renamed the FSA in 1997.

15. I have a specific familiarity with the EU Prospectus Directive in part because of my involvement over the last 10 years or so with the Swiss equity markets. Following a period as Counsel instructed by Swiss lawyers acting for the Swiss Stock Exchange in its various guises, I was invited to become the Deputy Chairman, and in due course the Chairman, of the London subsidiary of the Swiss Exchange in which the largest 28 or so of the Swiss listed stocks were exclusively traded[1].

16. Between 1966 and 1987 I was a lawyer in the UK Government Service, latterly as an Under Secretary in the Lord Chancellor's Department, with responsibility, in England and Wales, for the Civil and Criminal Courts, the Legal Aid Scheme (then costing £560m annually) and the regulation of the Legal Professions.

17. I understand the duty of an expert witness in my own jurisdiction to help the court on matters within my expertise, and the fact that this duty overrides any obligation to the person instructing me or paying me. I have complied faithfully with that duty.

**The UK context.**

18. The best starting point is to mention the two principal UK bases on which damages can be claimed by investors who suffer loss as a result of defects (a) in a prospectus or (b) in relation to what I might call "handling errors" in relation to an obligation to issue or

---

[1] The subsidiary was latterly known as SWX Europe Limited. As I recall, of the 28 or so constituents of the Swiss Market Index ("SMI"), two had secondary listings, one in the German Stock Exchange and one in Sweden. The rest were traded exclusively in the London subsidiary which provided a substantial proportion of the profits for the group as a whole. The trading of these securities was repatriated out of the European Union and back to Zurich in the course of 2009.

rely on a prospectus. Both arise in Part 6 of the Financial Services and Markets Act 2000 (**FSMA**).

19. <u>Offers to the public</u>. The most fundamental of these two principal bases is to be found in section 85 of FSMA.[2]. Subsection (1) states "It is unlawful for transferable securities to which this subsection applies to be offered to the public in the United Kingdom unless an approved prospectus has been made available to the public before an offer is made."
20. Breach of that subsection is a criminal offence (punishable if convicted on indictment (that is in the Crown Court, not by summary proceedings) by up to two years in prison and/or by an unlimited fine).[3]
21. Breach of that subsection is also actionable at the suit of a person who suffers loss as a result. That connotes civil liability as a standard claim by way of breach of statutory duty. See section 85(4) of FSMA. This means that it is a statutory liability akin to an action in tort. The wrongdoer in this case would be the maker of the offer to the public, who might or not be the issuer of the securities in question.[4]
22. The offer has to be made to the public in the United Kingdom. Somewhat surprisingly, proof that an offer has been made to the public is relatively easily satisfied. There is a specific provision in section 102B(1)[5] of FSMA which, so far as material, provides that "there is an offer of transferable securities to the public if there is a communication to any person which presents sufficient information on
    (a) the transferable securities to be offered, and
    (b) the terms on which they are offered,
to enable an investor to decide to buy or subscribe for the securities to be offered."
23. The phrase "to any person" shows that a single person will be sufficient. And this is made even clearer by section 102B(2) of FSMA which states "For the purposes of this Part, to the extent that an offer of transferable securities is made to a person in the United Kingdom it is an offer of transferable securities to the public in the United Kingdom." An offer to one person is an offer to the public. Equally an offer to a financial institution is an offer to the public even if no person who

---

[2] Section 85 appears at page 39 of the Opinion.
[3] See section 85(3) of FSMA.
[4] This imposition of criminal and civil liability flows from the wording of section 85(1), since the prohibited act is the offer. The rules about responsibility for the prospectus, which are made by the Financial Services Authority under section 84(1)(d), and which appear in those rules at PR 5.5.3 (and at Exhibit I to the Opinion), are consistent with this approach. They deal with "responsibility for the prospectus" and are thus concerned with the content of the prospectus rather than with the offer itself, though the offeror is, under those rules, included among those responsible for the content of the prospectus in the case of an offer.
[5] See page 78 of the Opinion

might be thought to be a real member of the public at large was aware, or could have been aware, of the existence or future existence of the securities.[6]

24. This extended definition of "offer to the public" is not just a matter of United Kingdom law. It stems from the EU Prospectus Directive[7] (**the PD**) which is now the formative influence on UK law in this field. Article 2.1(d) of the PD reads- " 'offer of securities to the public' means a communication to persons in any form and by any means, presenting sufficient information on the terms of the offer and the securities to be offered, so as to enable an investor to purchase or subscribe to these securities. This definition shall also be applicable to the placing securities through financial intermediaries." I judge the minor differences in wording (including a plural/singular switch for "person" and "persons") to be immaterial here.

25. It can be assumed that the transposition of the PD into Netherlands law will have secured a similar result.

26. Section 86 of FSMA sets out a number of cases where the offer, albeit made to the public, in this sense, is regarded as exempt from the criminal and civil consequences of section 85. These include offers to qualified investors (see section 86(1)(a) and (7), and Article 2.1.(e) of the PD[8]). Again there are exceptions for the qualified investors to act in turn in making further offers, specifically in section 86, of which the most usual one is section 86(1)(b) where the offer is made to a limited number of persons, that is less than 100 in each EU Member State (so a theoretical total of 2800 in all). This exclusion enables underwriters for example to dispose of the "rump" of an unsuccessful flotation of unquoted shares floated without a prospectus, by selling the shares in the "rump" to a limited number of (generally institutional) investors.

27. The liability for an unlawful offer is imposed on the offeror. If therefore in this case the so called Managers of the Global Offering (that is the London banks mentioned at page 163 of OM) (the **Managers**) were the offerors of an offer to the public (viz anyone) in the UK, then they would either need to have the benefit of a section 86 defence, or else need to have an approved prospectus to rely on. Further, if the issuer itself were to have made an offer to

---

[6] This made even clearer, in that section 102B(4) provides that an offer includes the placing of securities through a financial intermediary. That subsection assumes, as I see it, that the intermediary itself was not the recipient of an offer, but a person through whom an offer by another was made to the client/s of the intermediary. If the offeror intended that the intermediary should itself be able to buy the securities for itself or as agent for a client, then the (first) offer would in practice have been made to the intermediary.
[7] 2003/71/EC.
[8] Set out at page 117-8 of the Opinion.

the Managers to buy shares in advance of the Global Offering, there would have been an "offer to the public" at that earlier stage of the offer made to them. And, since the Managers were all based in London, any such "offer to the public" would almost certainly have been made in the United Kingdom.

28. There is no present claim against anyone in this case under section 85. But the absence of such a claim does not make this description above of section 85 liability irrelevant. That law is still potentially relevant to this case because it could, depending on the facts, have a real bearing on the question whether the United Kingdom was the home state for the purposes of the prospectus.

29. Liability for the content of the prospectus. The second main avenue in the UK for private rights to remedial damages is by use of section 90 of the FSMA.[9] Stripped to its essentials, section 90(11) ensures that section 90(1) has the following effect- "Any person responsible for the issue of a prospectus is liable to pay compensation to a person who has (a) acquired securities to which the prospectus applies and (b) suffered loss in respect of them as a result of (i) any untrue or misleading statement in the prospectus; or (ii) the omission from the prospectus of any matter required to be included by sections 87A[10] or 87G[11].".

30. Section 87A of FSMA contains the key content tests for a prospectus. The principal one is in subsection (2) which requires it to contain "the information necessary to enable investors to make an informed assessment of (a) the assets and liabilities, financial position, profits and losses, and prospects of the issuer . . . and (b) the rights attaching to the transferable securities."

31. Section 87G is about the need for a supplementary prospectus if new factors, material mistakes etc emerge during the early life of the securities (that is between the approval of the prospectus and the start of trading on a regulated market). It is included in UK law in compliance with Article 16 of the PD.[12]

32. As just stated[13], the liability for defects in a prospectus is imposed on persons "responsible for the issue of the prospectus". As Mr Bompas QC says,[14] that is a defined term, and exhibit I to his Opinion sets out the relevant definition, to be found in rules made by the FSA under the power conferred on the FSA by section 84(1)(d) of FSMA. Under rule PR 5.5.3, the persons responsible

---

[9] See pages 63 to 64 of the Opinion.
[10] See page 42 of the Opinion.
[11] See page 45 of the Opinion.
[12] There was a Supplementary Memorandum in this case, and it appears on its face to have been approved by the FMA in the Netherlands
[13] See paragraph 29 above.
[14] See paras 25.4 and 59 of the Opinion.

for the issue of a prospectus include the issuer, the directors of the issuer, future directors of the issuer (if named in the prospectus) and persons who have accepted responsibility for the prospectus or who have authorised its content.[15]

### The European context.

33. I now need to overlay upon the two main heads of liability in the UK some remarks about the EU angle lying above and beyond the UK itself.

Offers to the public .

34. First, there is some more to add arising from the fact that the prospectus in this case states both in the OM and in the SM that the document in question was approved by the Netherlands Authority for the Financial Markets ("**AFM**").

35. One of the major achievements of the PD was to create a passport system for free movement of prospectuses within the EU. If the contents of the document/s have been vetted by a competent authority in the "home state", State A, then the authorities in any other member states, "host states", have to accept the quality of the work done in State A and may not insist on doing it all again. So, under Article 17 of the PD, host member States do not undertake administrative procedures in relation to approved prospectuses from other states, and such prospectuses are valid for the purposes of offers to the public in other states.

36. All that is required for an offer to the public in a host State is that the home State should be identified; that it should be the one that approves the prospectus, and that it notifies the host State under the machinery provided for in Article 18. In our case that means that, if the Netherlands were indeed the home State, then the AFM would have notified the UK FSA. If there was no such notification, then the Dutch prospectus, albeit legal for offers in the Netherlands, would not give a UK issuer a defence to a charge of breach of section 85(1), or a defence to actions for civil liability for damage caused by that breach.

37. Equally, if the Netherlands were not the home State (an issue to which I will turn shortly), then the AFM should not have approved the prospectus at all; and any approval that it purportedly gave to a draft prospectus would be invalid. This is because Article 13.1 of

---

[15] All this flows from the EU minimum requirements for those to be responsible for the prospectus: see Article 6 of the PD. The UK list in the FSA rules is strikingly similar to the list prescribed by the UK Treasury for responsibility for listing particulars under section 79(3) of FSMA as to which see S.I. 2001/2956.

the PD states "No prospectus shall be published until it has been approved by the competent authority of the home Member State."

38. Under UK law, this is translated into domestic provisions. The obligation to identify the home member State appears in section 87A(1) of FSMA ("The competent authority[16] may not approve a prospectus unless it is satisfied that . . . the United Kingdom is the home State in relation to the issuer of the transferable securities to which it relates"). The ability to use in the UK an EU approved prospectus from another Member State appears in sections 85(7) and 87H[17]. In this case, it seems clear that the only prospectus was the one appearing to have been approved by the AFM.

Which is the right home State?

39. All this leaves out of account the crucial question whether the Netherlands was indeed the home State for these purposes, and I now need to turn to that issue.

40. Under Article 2.1(m) of the PD[18] there is a highly complex definition of "home Member State". It is in three parts, but we can ignore the first part (subparagraph (i)) because it applies only where the issuers are based in the EU with a registered office there. In this case the issuer is from Guernsey and Guernsey, albeit part of the wider concept of "the UK, Islands and Colonies" is not part of the UK as such, and therefore lies outside the EU. We can also ignore subparagraph (ii) which relates to certain non-equity securities, and therefore is inapplicable here, since the securities were equities or equity based.

41. All therefore depends on subparagraph (iii) which reads, so far as material, "for all issuers of securities incorporated in a third country . . .the Member State where the securities are intended to be offered to the public for the first time after the date of entry into force of this Directive or where the first application for admission to trading on a regulated market is made, at the choice of the issuer, the offeror or the person asking for admission, as the case may be, subject to a subsequent election by issuers incorporated in a third country if the home Member State was not determined by their choice."

42. The first point to make about this is that the determination of the home State can be fixed either by an intended offer, or by an application for admission to trading. The second is that where there is an option as between these two routes (intended offer, and application), the option is given to any of the three possible actors concerned (issuer, offeror or applicant "as the case may be") with

---

[16] By virtue of section 72 of FSMA references to the competent authority are references to the FSA. This does not of course apply to express references to competent authorities in other Member States.
[17] See pages 39 and 46 of the Opinion.
[18] See the Opinion at page118.

no apparent priority to any of them. (The issuer has one right that the others do not, which is that the issuer can secure a change of home State if the original home State was determined by the offeror or by the applicant for admission.)

43. The third point is that each of the two possible routes contains the word "first", and (ignoring transitionals relating to the date of entry into force of the directive) this seems to argue for a "once and for all purposes" determination of the home State. (The only exception to that is the issuer's right just mentioned to secure a change where the offeror or the applicant secured the original determination.) The provision is silent as to the result where there is an intended offer and an applicant's application at more or less the same time, but a fair reading of the language suggests that, as between those two possible routes, it is the first in time that counts. The only qualification is that in each case there appears to have to be something more than a simple intended offer or a simple application to admit to trading. There also has to be a "choice" by the offeror or applicant. However, this choice is not governed by any procedural formality or requirement, and it appears that the choice can be inferred from the intended offer or from the submission of the application. Thus, in my view, the words about "choice" are intended merely to indicate that there is no priority as between an offer and an application. It does not matter that the offer appears first in the text; what matters is which occurs first in practice on the ground.

44. It follows from this that the fact that the prospectus in this case was apparently approved by the AFM is not dispositive of the issue whether the Netherlands was in fact the home State. The AFM must have concluded that the Netherlands was the home State[19], but that does not mean that it was necessarily right so to conclude.

45. I am asked to assume that it was, in fact, intended to offer the issued shares for the first time in London. I am also asked to assume that this intention was not only that of the issuer itself, but also that of the persons who in due course became the actual offerors in the UK. On that basis, if the issuer also was the person asking for admission, all three of the persons given the choice by Article 2.1(m)(iii) had that intention. I am also asked to assume that they opted for (or rather "chose") the UK as the "home state" for the securities in question.

---

[19] This would be true unless, improbably, the impact of Article 13.1 of the PD was overlooked in this case by the AFM.

46. The intended offerors could well have been one or more of the Managers, or all of them acting together. They would have made such offers simply by taking the action described in Article 2.1.(d) of the PD (or section 102B(1) of FSMA), such as making an offer to another financial institution. But it is not necessary to prove that, and something even simpler than that, such as an offer at the very outset of the process by the issuer to one or more financial institutions (such as the Managers) would have been enough to trigger the determination machinery of Article 2.1 (m)(iii) of the PD.
47. There is already some evidence available to me to suggest that this is quite likely to have occurred. For example, it emerges from page 1 of the OM that the issuer "raised gross proceeds of $600 million from the sale of Class B shares" during the period September 2006-February 2007, well in advance of the global offering. The net proceeds were $590million (unaudited). This is not dissimilar to the amount expected to be raised by the global offering itself (page 146 of OM mentions a maximum figure from that offering of $525million). So it seems that more than half of the relevant class of shares had already been purchased before the global offering took place.
48. The "Initial Placement" of Class B shares "took place on or about February 28 2007", and involved "multiple closings on a number of dates". It also appears from pages 9 and 34 of the OM that the intention was to sell 19 million odd Class B shares in the global offering, and that, after that, there would be nearly 49 million Class B shares outstanding. This is also consistent with the view that over half the relevant class of shares had been offered and purchased in advance of the global offering. In addition, some of the Class B shares previously issued appear to have been the subject of a lock-up agreement whether for a period of 60 days or one of 180 days (see page 34 of the OM).
49. It therefore appears to me clear that there had been a series of offers of the Class B securities somewhere in the world well in advance of the offer made through the apparently approved prospectus. These offers were made by private placement (OM Page 1). I have not been able to find anything in the prospectus to indicate where the offers were made, and that fact remains to be established by further evidence. But the possibility that the United Kingdom was the first place in the EU where an offer was made to the public does not seem to me improbable.
50. If the evidence to be adduced at trial proves that there was an offer of the Class B shares in the UK and that it was the first offer in the EU, thus showing the last elements in the assumptions at paragraph

46 above to be justified, then the UK would indeed be the home State for the purposes of the PD. Equally, if the first offer of the Class B shares in the EU was in another Member State (say Austria, the first EU State mentioned in the list at OM page 153), that State would be the home State.

Possible qualifications to the view just expressed on the right home state.

51. I can see only three possible qualifications to that conclusion. The first would be if, before the intention to make an offer in the EU was formed, and the related "choice" was made, there had actually been an application in the Netherlands for admission to trading on the Dutch regulated market. Again, that would be a matter for further evidence, but it does seem improbable that there was an application for admission to trading in the Netherlands as early as September 12 2006, or even February 28 2007. I cannot tell when the application was made, but it was still outstanding on June 29 2007.

52. The second possible qualification is that the issuer
    a. might not have been the first person to make the offers in question inside the EU, and
    b. therefore might have had the right to switch the home state to the Netherlands under 3.1.(m)(iii) of the PD, and
    c. had actually exercised that right.

    I have not seen any evidence either way on that possibility.

53. The third possible qualification is that it might be argued that the determination machinery in Article 3.1(m)(iii) of the PD is triggered not just by any offer to the public to sell the relevant securities, but only by an offer that is made on the basis of a prospectus. I do not accept this suggestion, for two reasons. First, it seems to run clean contrary to the express language of the PD itself. Article 2.1 (d) does not mention the need for a prospectus; it does not, for instance, carve out the cases where a prospectus is not required (Article 4)[20]. Secondly, this suggestion would not make good administrative or good policy sense. If there had to be a prospectus before a home State could be identified, there would be something like a squirrel chasing its tail. No-one would know where they stood or to whom to apply for prospectus approval, unless and until a certain event like an application for admission was made. Even that would not work where it was proposed to

---

[20] It should be noted, incidentally, that Article 4 itself makes it plain in its opening words that an offer which is exempt from a prospectus requirement (eg because it is made to less than 100 persons) is still "an offer to the public".

make a prospectus offer without also ensuring trading of the securities on an EU regulated market. Further, if the test is an intended offer, it scarcely makes sense to insist on an approved prospectus at the stage of forming that intention. The general policy structure of the PD involves giving a very wide meaning to the expression "offer to the public" while imposing criminal and civil liability only on those offers that are genuinely made to the real public at large. This also enables all those who are damaged by prospectuses that are defective, albeit not legally required for the purposes of an offer, to make a claim (under Article 6(2) and, in the UK under section 90 of FSMA).

Liability for the content of the prospectus.

54. There is also an EU angle to the second key aspect mentioned at paragraph 29 above. However, in view of the points which I have already made, I can take it fairly shortly.

55. If the UK is the home State, then I need to address the question of the applicability of section 90 of the FSMA. While it is the view of Mr Bompas QC that the remedy under section 90 is not available in this case, that view is fully dependent on his assumption that the Netherlands is the home State. If Mr Bompas QC were asked to opine on the applicability of section 90 on the footing that the United Kingdom was the home State, it seems clear to me that he would indicate that on that basis it definitely would apply. I agree with that approach.

56. There remains, on this approach, however, one further wrinkle. If the UK is indeed the home State, then I have advised, at paragraph 37 above, that the prospectus purportedly approved by the Dutch AFM would not have been validly approved. In that event, there would still be room for argument as to the right approach to securing compensation for those who had been damaged by buying the shares in reliance on the "prospectus". Plainly, those who could show that there was a breach of section 85 (offers without an approved prospectus) would have a clear route through to redress under section 85(1) as modified by section 85(11). Those who actually bought in circumstances where a prospectus was not required (eg those where the relevant offer was an exempt offer to the public under section 86) would not be able to claim under section 90. However it seems to me that they would have possible alternative causes of action for, for example, misrepresentation, in that the sale purported to be on the basis of a document which not only contained defects of the kind alleged in the Complaint but was also a document falsely describing itself as an approved OM/SM..

### General

57. It therefore appears to me that the conclusions in the Opinion would be open to attack if, as seems reasonably possible, it turns out that the factual matrix on which the Opinion is built is different from the basis on which Mr Bompas QC approached his task. This is no criticism of him, but simply an example of the need to be sure of the facts before applying the law to them, and thus of the problems facing an expert who is instructed at an early stage of the case before the facts are clear.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

**Executed this 6th day of June 2012**           *[signature: Michael Blair]*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| E. L. Phelps, M.J. McLister, D.J. Wu, S.M. Liss and <br> W.F. Schaefer, individually and on behalf of <br> all others similarly situated, <br><br> Plaintiffs <br><br> v. <br> ABJ <br> JOHN CRUMPTON STOMBER, et. al, <br><br> Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case Number 1:11-CV-01142 <br> ) <br> ) <br> ) <br> ) <br> ) |

DECLARATION OF MICHAEL BLAIR QC

Dated 6 June 2012