# EXHIBIT A

| Plaintiffs' Table, Columns A and B (Defs' Column A): Misrepresentations and Omissions and New Factual Allegations Pertinent to the Alleged Omissions | Defendants' Column C – Alleged Disclosures | Why The Alleged Disclosures Were Inadequate and/or Meaningless |
|---|---|---|
| 1. "[T]he Offering Memorandum failed to disclose the liquidity crisis that had occurred and was continuing to occur at CCC in June 2007, that was described by Stomber internally as a 'major liquidity event' and his seizing of 'emergency powers.'" Complaint,[1] ¶ 88. This event demonstrated that CCC was in deep and irrevocable trouble, and the failure of its business model, which was predicated on specific market conditions which no longer existed. CCC was now considerably more likely to fail than it was to meet its objectives. *Id*. This "event" and its consequences were material to investors' determination whether to invest in CCC, and were required to be disclosed to them, were integral to the Offering, and in order to make other representations in the Offering Memorandum not misleading. *Id*. | Ex. 1, OM, at 7, 74 ("In the past, we have deviated from these guidelines with the approval of a majority of our independent directors and we may do so again in the future.") (emphasis added). | Disclosing that CCC had deviated from its guidelines at some unspecified time to some unspecified degree, and might do so again, is not the equivalent of disclosing a liquidity crisis that occurred on the eve of the Offering.

It is also not the same as disclosing that CCC had on the eve of the Offering, reduced the minimum liquidity cushion from 20% to 10%. Plaintiffs do not allege in the proffered amended complaints that this failure was an actionable omission – the only actionable omission alleged is the failure to disclose the liquidity crisis. |
| | Ex. 1, OM, at 8 ("As a result of changes in interest rates, we estimate that from April 1, 2007 to June 13, 2007, our fair value reserves declined by approximately $28.9 million | This statement was a misleading partial disclosure. By June 13, 2007, the defendants already knew, as reflected in internal email correspondence, that the decline in fair value reserves was much worse than the decline that they would |

[1] For ease of reference, all references to the "Complaint" refer to the proposed "Amended Consolidated Complaint" in No. 11-cv-1142. The proposed "Second Amended Complaint" in No 11-cv-02287 is identical for all purposes pertinent to this filing.

| | | |
|---|---|---|
| | (unaudited), from approximately $24.0 million (unaudited) as of March 31, 2007 to an estimated $(4.9) million (unaudited) as of June 13, 2007. . . . | disclose in the OM.  Complaint, ¶ 75. They knew this well before the June 19, 2007 publication date of the OM. |
| | Further changes in interest rates or other factors would result in further changes in our fair value reserves and total equity per Class B share.") | This is a statement about events that might occur, not a disclosure of any event that had already occurred. |
| | Ex 1, OM, at 12 ("Many of our investments may be susceptible to economic slowdowns or recessions, which could lead to material losses on our investments.  An economic slowdown or recession, in addition to other factors such as an excess supply of properties, could have a material negative impact on the values of both residential real estate and commercial real estate properties. If residential and/or commercial real estate property values decrease materially it may cause borrowers to default on their mortgages or negotiate more favorable terms and conditions on their mortgages. As a result, we may realize material losses related to foreclosures or to the restructuring of our mortgage loans and the mortgage loans that back the mortgage-backed securities in our investment portfolio. Unfavorable economic conditions also could increase our funding costs, limit | This is a statement about events that might occur, not a disclosure of any event that had already occurred. |

| | our access to the capital markets or result in a decision by lenders not to extend credit to us.") (emphases added); | |
|---|---|---|
| | *see also* Ex. 1, OM, at 13. | Page 13 of the OM contains a laundry list of risk factors.   They are all statements about events that might occur.   There are no disclosures, on that page, of any event that had already occurred. |
| a.  Plaintiffs have added allegations pertaining to why the omission was misleading. | | |
| (i)  Plaintiffs have explained, in considerably more detail, CCC's business model and narrow operating margins, and how it depends on very specific conditions in the repo lending market in order to meet its objectives, or even merely to survive. *Id.*, ¶¶ 41-54. | CCC's business model was described in extraordinary detail in the OM. None of the aspects of CCC's business model that are described in the PACC were omitted from the OM: | There is no allegation that CCC's business model was not adequately described.   These additional factual allegations were added to explain the materiality of the adverse events occurring in June 2007, which may not have been described as clearly in the operative complaints addressed by the Court. |
| | Ex. 1, OM, at 1 ("Our objective is to achieve attractive risk-adjusted returns for shareholders through current income and, to a lesser extent, capital appreciation. We seek to achieve this objective by investing in a diversified portfolio of fixed income | This is a statement about CCC's business model.   Plaintiffs have not alleged that Defendants misrepresented the nature of CCC's business model. Plaintiffs have alleged that Defendants failed to disclose that CCC's business model was failing. |

3

| | | |
|---|---|---|
| | assets consisting of mortgage products and leveraged finance assets. Our income is generated primarily from the difference between the interest income earned on our assets and the costs of financing those assets as well as from capital gains generated when we dispose of our assets."). | |
| | Ex. 1, OM, at 5 ("We utilize leverage extensively, which we may employ without limit, both through borrowings and/or through market exposure, to increase the potential returns on our investments. The actual amount of leverage we may employ depends on a variety of factors, including type and maturity of assets, cost of financing, credit profile of the underlying assets and general economic and market conditions. . . . Once the net proceeds from the global offering are fully deployed in the various asset classes in which we intend to invest, we expect our leverage ratio to be approximately 29 times (unaudited), based on our expected capital allocation set forth above.  Our leverage ratio will change as our allocation of capital varies. Our primary source of financing is currently repurchase agreements with respect to our RMBS assets. | This is a statement about CCC's business model.  Plaintiffs have not alleged that Defendants misrepresented the nature of CCC's business model. Plaintiffs have alleged that Defendants failed to disclose that CCC's business model was failing. |

| | | |
|---|---|---|
| | As of March 31, 2007, we had approximately $16.1 billion (unaudited) in borrowings under secured repurchase agreements, with a weighted average borrowing rate of 5.30% (unaudited), a weighted average remaining maturity of 22 days (unaudited) and accrued interest payable of $19.3 million (unaudited)."). | This is a disclosure of a fact, but Plaintiffs have not alleged that Defendants misrepresented CCC's outstanding obligations under its repurchase agreements. |
| | Ex. 1, OM, at 13 ("While borrowing and leverage present opportunities for increasing total return, they have the effect of potentially increasing losses as well. If income and appreciation on investments made with borrowed funds are less than the cost of the leverage, or under certain circumstances, if the borrowing is terminated by the lender or counterparty in advance of its stated term, our total equity may decrease. Accordingly, any event which adversely affects the value of our investments would be magnified to the extent leverage is employed. Increased leverage also increases the risk that we will not be able to meet our debt service obligations, and consequently increases the risk that we will lose some or all of our assets to foreclosure or sale."). | This is a statement about events that might occur, not a disclosure of any event that had already occurred. |

| | | |
|---|---|---|
| | Ex. 1, OM, at 14 ("Expiration or termination of available financing for leveraged positions, and the requirement to post collateral in respect of changes in the market value of leveraged exposures, can rapidly result in adverse effects to our access to liquidity and our ability to maintain leveraged positions, and may cause us to incur material losses. We expect to borrow or utilize other forms of leverage (on a secured or unsecured basis) for any purpose, including to increase investment capacity, cover operating expenses, make redemption or distribution payments or for clearance of transactions. However, there is no guarantee that any such borrowing arrangements or other arrangements for obtaining leverage will remain in place for the duration of our company."). | This is a statement about events that might occur, not a disclosure of any event that had already occurred.  It is also, largely, a statement about CCC's business model.   Plaintiffs have not alleged that Defendants misrepresented the nature of CCC's business model. Plaintiffs have alleged that Defendants failed to disclose that it was failing. |
| | Ex. 1, OM, at 14 ("Despite extensive statistical testing of relevant data, the Liquidity Cushion is not designed to protect us under all possible adverse market scenarios. Therefore, we cannot assure that the Liquidity Cushion will be sufficient to satisfy margin calls on our financed securities that may arise in connection with highly unusual adverse market | This is a statement about events that might occur, not a disclosure of any event that had already occurred. It is also, largely, a statement about CCC's business model.   Plaintiffs have not alleged that Defendants misrepresented the nature of CCC's business model. Plaintiffs have alleged that Defendants failed to disclose that it was failing. |

| | | |
|---|---|---|
| | conditions."). | |
| | Ex. 1, OM, at 15 ("The adverse effect of a decline in the market value of our assets may be exacerbated in instances where we have borrowed money based on the market value of those assets. If the market value of those assets declines, the lender may require us to post additional collateral to support the loan. If we were unable to post the additional collateral, we would have to sell the assets at a time when we might not otherwise choose to do so. A reduction in credit available may reduce our earnings and, in turn, cash available for distribution to investors."). | This is a statement about events that might occur, not a disclosure of any event that had already occurred. It is also, largely, a statement about CCC's business model. Plaintiffs have not alleged that Defendants misrepresented the nature of CCC's business model. Plaintiffs have alleged that Defendants failed to disclose that it was failing. |
| | Ex. 1, OM, at 13 ("We may employ leverage without limit, which may result in the market value of our investments being highly volatile, limit our range of possible investments, and adversely affect our return on investments and the cash available for distributions. An investment in the Class B shares or RDSs is suitable only for investors who are experienced in analyzing and bearing the risks associated with investments having a very high degree of leverage.") (emphasis in original). | This is a statement about events that might occur, not a disclosure of any event that had already occurred. It is also, largely, a statement about CCC's business model. Plaintiffs have not alleged that Defendants misrepresented the nature of CCC's business model. Plaintiffs have alleged that Defendants failed to disclose that it was failing. |
| | Ex. 1, OM, at 49 ("Our investment | This is a statement about the |

| | | |
|---|---|---|
| | portfolio consists of both investment-grade and noninvestment grade securities and non-rated debt. As of March 31, 2007, we had allocated $320.4 million (unaudited) of capital to our RMBS portfolio. Utilizing the significant leverage available in this asset class, this capital allocation allowed us to acquire an RMBS portfolio (not including the Liquidity Cushion) of approximately $16.4 billion (unaudited) as of March 31, 2007.”). | composition of CCC's investment portfolio.  Plaintiffs do not allege, and have not alleged, that Defendants misrepresented the composition of CCC's portfolio. |
| (ii)  Plaintiffs have further explained, in much more detail than previously provided, how the repo market operates, and the specific conditions that had arisen in June 2007 that made it extremely unlikely that CCC would ever be profitable, or even survive.  *Id.*, ¶¶ 68-73. | CCC's OM did not describe the mechanics of the repo market, but these facts are irrelevant because a securities offering is not required to disclose public information about financial markets. *See CD* Mem. at 15 (citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 377 (3d Cir. 1993)); *Ning Yu v. State St. Corp.*, 686 F. Supp. 2d 369, 377 (S.D.N.Y. 2010)). | The previously dismissed complaints did not explain the run on the repurchase market that caused the undisclosed liquidity crisis. |
| b.   Plaintiffs have further explained that the partial disclosure of drops in the net asset value of CCC's portfolio (CCC disclosed the relatively modest declines in net asset value occurring prior to June 7, but not the more significant declines occurring thereafter), while certainly one relevant factor contributing to the liquidity crisis, was not the equivalent of disclosing the existence of a crisis that | Ex. 1, OM, at 13-14 (“Most leveraged transactions require the posting of collateral. The amount of collateral required to be posted may increase rapidly in the context of changes in market value of the assets to which we have leveraged exposure—whether in the form of credit facilities,  derivative transactions or otherwise. . . . Any | This is a statement about events that might occur, not a disclosure of any event that had already occurred. |

| | | |
|---|---|---|
| demonstrated the failure of CCC's business model. *Id.*, ¶¶ 93, 105.<br><br>c.  Plaintiffs have added additional allegations concerning materiality, ¶¶ 89-90, including pleaded precisely which affirmative representations were rendered misleading by the omission in question. *Id.*, ¶ 91. | failure by us to fulfill any collateral requirement (e.g., a so called "margin call") may result in a disposition of our assets at times and prices which could be disadvantageous and could result in material losses.") (emphasis added). | This is a statement about events that might occur, not a disclosure of any event that had already occurred. |
| | Ex. 1, OM, at 8 ("As a result of changes in interest rates, we estimate that from April 1, 2007 to June 13, 2007, our fair value reserves declined by approximately $28.9 million (unaudited), from approximately $24.0 million (unaudited) as of March 31, 2007 to an estimated $(4.9) million (unaudited) as of June 13, 2007. . . . Further changes in interest rates or other factors would result in further changes in our fair value reserves and total equity per Class B share."). | This statement was a misleading partial disclosure.   By June 13, 2007, the Defendants already knew, as reflected in internal email correspondence, that the decline in fair value reserves was much worse than the decline that they would disclose in the OM.   Complaint, ¶ 75. They knew this well before the June 19, 2007 publication date of the OM. |
| | Ex. 1, OM, at 12 ("Many of our investments may be susceptible to economic slowdowns or recessions, which could lead to material losses on our investments. An economic slowdown or recession, in addition to other factors such as an excess supply of properties, could have a material negative impact on the values of both residential real estate and commercial real estate properties. If residential and/or commercial real estate property values decrease materially it | This is a statement about events that might occur, not a disclosure of any event that had already occurred. |

| | | |
|---|---|---|
| | may cause borrowers to default on their mortgages or negotiate more favorable terms and conditions on their mortgages. As a result, we may realize material losses related to foreclosures or to the restructuring of our mortgage loans and the mortgage loans that back the mortgage-backed securities in our investment portfolio. Unfavorable economic conditions also could increase our funding costs, limit our access to the capital markets or result in a decision by lenders not to extend credit to us."). | |
| | Ex. 1, OM, at 14 ("Expiration or termination of available financing for leveraged positions, and the requirement to post collateral in respect of changes in the market value of leveraged exposures, can rapidly result in adverse effects to our access to liquidity and our ability to maintain leveraged positions, and may cause us to incur material losses. We expect to borrow or utilize other forms of leverage (on a secured or an unsecured basis) for any purpose, including to increase investment capacity, cover operating expenses, make redemption or distribution payments or for clearance of transactions. However, there is no | This is a statement about events that might occur, not a disclosure of any event that had already occurred.<br><br>It is also, largely, a statement about CCC's business model. Plaintiffs have not alleged that Defendants misrepresented the nature of CCC's business model. Plaintiffs have alleged that Defendants failed to disclose that it was failing. |

| | | |
|---|---|---|
| | guarantee that any such borrowing arrangements or other arrangements for obtaining leverage will remain in place for the duration of our company."). | |
| | *See also, supra*, Ex. 1, OM, at 1, 5, 7, 8, 12, 13, 14, 15, 49 and 74. | Pages 1, 5, 7, 49 and 74 contain discussions of CCC's business model and the nature of its portfolio.<br><br>Page 8 contains a misleading partial disclosure ("Recent Developments"). By June 13, 2007, the Defendants already knew, as reflected in internal email correspondence, that the decline in fair value reserves was much worse than the decline that they would disclose in the OM. Complaint, ¶ 75. They knew this well before the June 19, 2007 publication date of the OM.<br><br>Pages 12-15 contain descriptions of various risks of adverse conditions that could occur, but contain no disclosures of any events that had already occurred.<br><br>With the exception of the misleading partial disclosure on Page 8, none of these pages contain any disclosure of an adverse event that had already occurred. |
| 2.   Plaintiffs have alleged that the Defendants continued to conceal, through the closing of the Offering on July 3, 2007, the fact that a | | |

| | | |
|---|---|---|
| liquidity crisis had occurred, and engaged in a course of conduct designed to allow them to later claim that they had made remedial disclosures, without actually providing any meaningful or timely disclosure, and without affording investors a legal or practical means of withdrawing from the Offering. *Id.*, ¶¶ 102-13. | | |
| Plaintiffs have added several paragraphs of allegations pertaining to the circumstances in which the SOM was filed and (not) distributed, as well as its contents. *Id.*, ¶¶ 102-13. The filing of the SOM, which disclosed further declines in net asset value, appeared to be material to the Court's determination that no material omission occurred. The more detailed allegations of the proposed amended complaints make abundantly clear that | | |
| a. the SOM was not distributed to anyone and was issued in a manner rendering it unlikely to be seen by Plaintiffs or any members of the Class, *id.*, ¶¶ 102-06, | Miller Ex. C (June 28, 2007 Press Release) (describing the SOM, identifying locations where it will be available, including the fax, email and telephone number of CCC's paying agent, ING). Miller Ex. D (June 29, 2007 Press Release) (announcing approval of supplemental offering memorandum; notifying investors that "the supplemental offering memorandum, in the English language, may be obtained free of charge from CCC at" CCC's Guernsey offices, and "from the managers of the offering and | Defendants do not dispute that the SOM was not distributed to anyone.<br><br>Providing contact information for CCC's alleged office in Guernsey (CCC had no personnel in Guernsey) or a bank's office in Amsterdam is not the same as distributing the document to investors or providing an Internet link to download it.<br><br>The most significant piece of information contained in the SOM was not brought to investors' attention. Defendants do not dispute that the press |

| | from ING Bank, N.V."; and providing ING's fax, email and phone number). | releases did not indicate that any new financial information would be provided in the SOM.  *See* Point 2(b), *infra*. |
|---|---|---|
| b. the three press releases (issued during the five day period surrounding the issuance of the SOM), the full text of which is included in the Complaint, never mention that any financial information would be provided in the SOM, *id.*, ¶¶ 102, 105, 109, | Miller Ex. C (June 28, 2007 Press Release) ("CCC is preparing a supplemental offering memorandum that will contain a revised timetable for the global offering *and other changes to the terms of the global offering*. This supplemental offering memorandum must be read in conjunction with the offering memorandum dated June 19, 2007 relating to the global offering.") (emphasis added). Miller Ex. D (June 29, 2007 Press Release) ("For further information in respect of the global offering, the Class B shares and CCC, reference is made to the offering memorandum dated June 19, 2007 and the supplemental offering memorandum dated June 29, 2007. The supplemental offering memorandum is supplemental to, forms part of and must be read in conjunction with the offering memorandum."). | The Defendants have conceded this point.  The press releases did not disclose a further $84 million decline to the Fair Value Reserves, but only that there were "other changes" to the terms of the Offering , and that the SOM "should be read."  The release of the adverse financial information was not a change to the terms of the Offering.

The press releases should have prominently disclosed (1) the dramatic further reduction in fair value reserves and the liquidity crisis that occurred in June 2007, and (2) a procedure for investor withdrawal from the Offering. Instead, the press releases were generic and innocuous, and there was no procedure for withdrawal. |
| c. the now pleaded subscription dates of the Plaintiffs  show that seven of the eight Plaintiffs in these actions had  executed their subscription agreements before the SOM was | | The Defendants offer no explanation as to how the SOM could have any pertinence to investors who have already made their purchases and have |

| | | |
|---|---|---|
| filed, *id.*, ¶¶ 81, 98-101, 107, | | no legal right, or practical ability, to withdraw, especially since any right to revoke, or how to do so, was never mentioned in the Press Release or the SOM. |
| d. the fact that the Offering concluded on July 3, 2007, two business days following the filing of the supplement, as reflected in CCC's express release of the "final" sales figures for the Offering, *id.*, ¶¶ 108-09, 111, 113 | Ex. 4, SOM, at cover ("The Class B shares are offered by the managers subject to their receipt and acceptance of any order by them and *subject to their right to reject any order in whole or in part and will be ready for delivery on or about July 11, 2007 (the 'Settlement Date'). . . . The number of Class B shares and RDSs offered in the global offering can be further decreased or increased prior to the Settlement Date.* Any such further decrease or any increase may be material. Any further decrease or any increase in the maximum number of Class B shares and RDSs being offered in the global offering will be announced in a press release issued in the Netherlands. . . . The actual number of Class B shares and RDSs offered in the global offering and the results of the global offering will be announced in a press release and in a pricing statement in the Netherlands on or about July 4, 2007 that will be available in printed form at our registered office, at the offices of | Defendants ignore that Plaintiffs have now pleaded that (1) CCC did not reject any orders, and (2) the July 11, 2007 date was merely a "delivery" date, and (3) the SOM itself indicated that "The actual number of Class B shares and RDSs offered in the global offering and the results of the global offering will be announced in a press release and in a pricing statement in the Netherlands on or about July 4, 2007," and (4) a press release was, in fact, issued on July 3, 2007 describing the "final" number of shares issued. The alleged "Settlement" on July 11, 2007 was nothing more than an administrative formality. |

| | the joint bookrunners and at the office of the paying agent in the Netherlands.") (emphasis added). | |
|---|---|---|
| e. the date of July 11, 2007, described in the SOM, and erroneously (subject to correction under Rule 59(e)) by the Court, as the "settlement date," was merely, as described in the SOM itself, the date on which paper certificates would be distributed, *id.*, | *See, supra*, Ex. 4, SOM, at cover. Ex. 4, SOM, at 9 (describing "Expected Timetable for the Global Offering" and identifying July 3, 2007 as the date for the "expected allotment of the RDSs and Class B shares in Canada and to certain other Investors," July 4, 2007 as the date for the "expected allotment of the balance of the Class B shares," July 4, 2007 as the date on which the shares would be listed on Euronext and July 11, 2007 as the "settlement date or closing date"); *id.* ("The timetable for the global offering is subject to acceleration or extension. Any acceleration or extension of the timetable for the global offering will be announced in a press release (together with any related revision of the expected dates of pricing, allocation and closing) at least two hours before the proposed expiration of the accelerated timetable for the global offering or, in the event of an extended timetable for the global offering, at least two hours before the expiration of the original timetable for the global offering. Any extension of the timetable for the global offering will be | Defendants ignore that Plaintiffs have pleaded that (1) CCC did not reject any orders, and (2) the July 11, 2007 date was merely a "delivery" date, (3) the SOM itself indicated that "The actual number of Class B shares and RDSs offered in the global offering and the results of the global offering will be announced in a press release and in a pricing statement in the Netherlands on or about July 4, 2007," and (4) a press release was issued on July 3, 2007 describing the "final" number of shares issued. The alleged "Settlement" on July 11, 2007 was nothing more than an administrative formality. |

| | | |
|---|---|---|
| | for a minimum of one full business day. The subscription period will be for a minimum of six business days."). | |
| f. the subscription documents themselves, which are incorporated in the Offering Memorandum, show that Plaintiffs' purchase orders (Offering subscriptions) were irrevocable, *id.*, ¶¶ 96, 106, 113, | Ex. 1, OM, at A-2 ("If purchasing in the Regulation D Offering, upon the terms and subject to the conditions set forth in this Purchaser's Letter, the Investor hereby irrevocably agrees to purchase from the Company up to such number of RDSs as is set forth on the signature page hereof *at any price between $20.00 and $22.00 per RDS as is published by the Company as the initial offering price for the RDSs and the Class B shares or such other price as is mutually agreed.*") (emphasis added). | Under the Defendants' bizarre construction of the operative clause of the purchase contract they drafted, (1) there was no agreement at all to purchase in place unless the Offering was priced between $20 and $22, and, by unilaterally electing to set the lower price of $19, CCC effectively terminated the entire agreement; and (2) a purchaser would be bound at a contractually agreed upon price specified in a contract, but not at a more favorable price later unilaterally agreed to by the seller.<br><br>Additionally, as noted elsewhere, even if one were to accept Defendants' strained interpretation of the clause, there was no procedure in place to effect withdrawal from the subscription agreement. Nor, without a trial, can it be determined if any investor read the SOM, tried to revoke, or was allowed to do so. |
| | Ex. 1, OM, at A-1 ("The Investor has received a copy of the offering memorandum dated June 19, 2007 relating to the offering of the RDSs and Class B shares described therein (the | There is nothing in these voluminous excerpts of boilerplate suggesting that the investment was revocable as a matter of law. Nor is there anything suggesting that the investment was |

| | | |
|---|---|---|
| | 'Offering Memorandum'). *The Investor understands and agrees that the Offering Memorandum speaks only as of its date and that the information contained therein may not be correct or complete as of any time subsequent to that date.*") (emphasis added). Ex. 1, OM, at A-4 ("In the case of an Investor purchasing as an Accredited Investor and Qualified Purchaser in the Regulation D Offering, the Investor has had access to all information that it believes is necessary, sufficient or appropriate in connection with its purchase of the RDSs, it has been afforded an opportunity to ask questions concerning the terms and conditions of the offering and sale of the RDSs and the Class B shares represented thereby, it has had all such questions answered to its satisfaction, it has been supplied with all additional information it has requested and, after being advised by persons deemed appropriate by the Investor concerning the Offering Memorandum, this Purchaser's Letter and the transactions contemplated hereby, it has made an independent decision to purchase the RDSs based on information it has determined to be adequate to verify the accuracy of (i) | revocable as a matter of fact – there simply was no procedure for withdrawal. |

| | | |
|---|---|---|
| | the information in the Offering Memorandum and (ii) any other information that the Investor deems relevant to making an investment in the RDSs."). *See also* Ex. 1, OM, at cover ("The number of Class B shares and RDSs offered in this global offering can be increased or decreased at any time prior to the settlement date . . . . Any increase or decrease in the maximum number of Class B shares and RDSs being offered in this global offering will be announced in a press release issued in the Netherlands. The actual number of Class B shares and RDSs offered in this global offering will be determined after taking into account the conditions and factors described under 'The Global Offering' and 'Plan of Distribution.' Such actual number of Class B shares and RDSs offered in this global offering and the results of the global offering will be announced in a press release and a pricing statement on or about June 28, 2007 that will be available in printed form at our registered office, at the offices of the joint bookrunners and at the office of the paying agent in the Netherlands."). | |
| g. there was no procedure in existence, even less one described to investors, for investors to | | The Defendants offer no response here. There is none to be made. |

| | | |
|---|---|---|
| withdraw their subscriptions. *Id.*, ¶¶ 113, and | | |
| h.  the SOM did not disclose the existence of the liquidity crisis that demonstrated the failure of CCC's business model, nor did it otherwise correct or amend anything in the Offering Memorandum, rendering it largely irrelevant whether it was procedurally sufficient. *Id.*, ¶ 106. | Ex. 4, SOM, at 8-9 ("We estimate that from April 1, 2007 to June 26, 2007, our fair value reserves declined by approximately $84.2 million (unaudited), from approximately $24.0 million (unaudited) as of March 31, 2007 to an estimated $(60.2) million (unaudited) as of June 26, 2007. This compares to an increase in our fair value reserves from January 1, 2007 to March 31, 2007 of approximately $11.6 million (unaudited). Although we did not close our financial records as of June 26, 2007, our preliminary estimate of our total equity per Class B share as of June 26, 2007 was approximately $18.65 (unaudited)."). | This was a disclosure of adverse information, but not of any value to participants in the Offering who had no clear notice of a right to withdraw or how to do it.  Additionally, it was only a partial and inadequate disclosure, because there was no discussion of the liquidity crisis that occurred, and how CCC's business model was no longer viable in prevailing market conditions. |
| | Ex. 4, SOM, at 8 ("Subsequent to March 31, 2007, there have been changes in our capitalization through June 26, 2007, other than those shown in the table above, including (i) an increase of approximately $5.16 billion (unaudited) in repurchase agreements due to our deployment of additional capital from the 26% (unaudited) of our capital that was allocated to the Liquidity Cushion at March 31, 2007, (ii) our drawdown of the Bridge Loan of approximately $191.7 million (unaudited), which we expect to repay | Plaintiffs do not allege that Defendants made misrepresentations or omissions concerning CCC's short term loans, its outstanding repurchase obligations or the composition of its portfolio, which are the subjects of the excerpted text. None of this information suggests that a liquidity crisis occurred in June 2007. |

| | | |
|---|---|---|
| | from the net proceeds of the global offering, and (iii) the issuance by CCIL of $800 million (unaudited) aggregate principal amount of term Notes, the proceeds of which were used to repay the revolving loan and for additional bank loan purchases. In addition, see the information appearing in 'Recent Developments' for a description of certain changes to our fair value reserves."). | |